UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:03-CR-73 |
| | ) | |
| | ) | |
| NICHOLAS CLAY | ) | |

## **M E M O R A N D U M   O P I N I O N and O R D E R**

This criminal matter is before the Court for sentencing. Pursuant to this Court's interpretation of *United States v. Booker,* ---U.S.---, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), this Court must decide, on a case by case basis, what sentence is reasonable based upon a consideration of the otherwise applicable guidelines range as well as the other statutory factors which are set forth in the Sentencing Reform Act. Title 18, U.S.C. § 3553(a) requires a sentencing court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for:
    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission . . .;
(5) any pertinent policy statement issued by the Sentencing Commission . . .;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

In deciding the question of how much weight the guidelines should carry in arriving at a reasonable sentence, this Court FINDS, post *Booker*, that the guidelines, although advisory and only one factor among others to be considered in arriving at a reasonable sentence, are entitled to substantial weight in the sentencing decision. Only when clearly outweighed by some other factor(s) set forth in § 3553(a) will the Court be inclined to sentence outside the appropriate guideline range. *See United States v Musick*, No. 2:03-CR-62, Doc. No. 605 (E.D. Tenn. Jan. 21, 2005) (Greer J.)

The Court's analysis in regard to the applicable factor(s) set forth in § 3553(a) is as follows:

1. <u>THE NATURE AND CIRCUMSTANCES OF THE OFFENSE</u>

The Court FINDS that the offense of conspiracy to distribute and to possess with the intent to distribute 50 grams or more of cocaine base or crack is a serious offense. In fact, nearly half of the criminal cases heard by this Court are drug cases and a large

2

percentage of the criminal cases that charge other federal criminal offenses involve the use of drugs.

2. <u>THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT</u>

Although this defendant has made many poor choices in his life, this Court cannot think of another defendant who has appeared before this Court who has had such a difficult childhood. The defendant grew up without a father, which is not a particularly unique situation. However, the Court FINDS that the family history given by Clay's mother, Madie Annette Clay, in a letter filed with the Supplement to Sentencing Memorandum of Defendant Nicholas Clay, details a nightmare of a childhood.

In her letter, Clay's mother stated that she, Clay, his brother, and his sister moved out of her father's house in 1987 when her father remarried. She said the family started having really hard times at that point in time. When Clay was 7 years old, she started using crack cocaine and stopped taking care of her children because she was so involved in drugs. Clay was "bounced around with relatives" because she wasn't there to take care of him. She admitted that all the money that she made, she spent on drugs. The family never stayed in one place for very long because she didn't pay the rent or the bills, and there were times when Clay didn't have anywhere to stay. His mother knew that sometimes her children didn't have much to eat, but at the time, she was a user and didn't make choices that were good for her children.

3

In her letter, Clay's mother also stated that in 1989 she knew that she had to get help for her addiction problem. She just decided one day that she had to go to rehab but she didn't tell anybody so her children just woke up one morning and she was gone. Clay was abandoned along with his brother and sister. Although they had been exposed to neglect and hard times before, but they were now on their own. Clay's mother didn't know what happened to them during the next year while she was in rehab. Other evidence in the record establishes that, when the landlord learned that the mother was not present and that she could not collect the rent, he put Clay and his siblings "out on the street".

In 1990 when she was released from rehab, she found her children and they were reunited. Although she was clean for about a year, she relapsed. Clay was 10 years old at the time and was very impressionable. This was when he first met the drug dealers from whom she bought crack. She stated that she was also trying to sell drugs, and there was a lot of that kind of activity around their house. In fact, the only male authority or father figure ever in Clay's life were the drug dealers with whom his mother was dealing.

Until Clay was 14, his mother was abusing crack and was in active addiction. She decided again that she had to get clean, and she left again. This time she asked Clay to call his father and see if he could stay with him because she had to go to rehab and there was nowhere else for Clay to stay. Clay knew who his father was, but he had never really known him. Clay called his father who told him he didn't know why he was calling

4

because he wasn't his father and he didn't want anything to do with him. Clay's mother believes that this rejection totally devastated Clay.

After his mother left, Clay went to live with his sister, who was a college student, a single mom, and was employed. Clay's mother did not think her older kids were affected by her addiction as much as Clay because they had more time to grow up before it all started happening, and Clay was very young. Clay's older brother had left to go into the service, and Clay's sister was trying to care for her baby and for Clay. Clay got a job working at a grocery store trying to help pay the bills. He made friends with some people he worked with, and she believes this was when he started trying out drugs and drinking, and started running with some older people who were a bad crowd. Clay ended up involved with an older man in an armed robbery at age 16 while his mother was living in a halfway house.

Although Clay became involved in the conspiracy charged in this indictment in 2002, he returned to Burlington, North Carolina in January of 2003, where he remained uneventfully until his arrest on February 10, 2004. After he withdrew from the conspiracy and returned to North Carolina, he reestablished his relationship with his mother who was now drug free and managing Homes That Care, a place for children who need counseling. In her letter, his mother wrote that he was seeking employment but his criminal record made it very difficult for him to find a job.

As an alternative to outside employment, she noted that it was resourceful

of him to babysit full time for his children, and that he kept telling her that he didn't want his kids to grow up without a father. He started taking his son Noah to church, started reading to Noah, and spending time with the family in general.

Based upon these facts, the Court FINDS that Clay's family circumstances[1] and his characteristics are very significant and should be accorded additional weight in determining a reasonable sentence. Growing up, he apparently had no chance at all, but after he withdrew from the conspiracy and returned to live with his mother, he reestablished his family ties and lived crime free for over a year.

3. THE NEED FOR THE SENTENCE IMPOSED

It should be noted that the defendant received 7 out of 10 of his criminal history points in connection with three misdemeanor convictions:

1. Possession of drug paraphernalia and maintaining a place for the sale of a controlled substance on January 10, 2001 for which he received 2 points;

2. Possession of less than one-half ounce of marijuana on March 27, 2001 for which he received 1 point; and

3. Attempted larceny on May 2, 2002 for which he received 1 point.

---

[1] This Court ordinarily does not deem family circumstances to be a sufficient reason to justify a lower sentence than would otherwise be imposed and generally tells defendants that the source of their troubles is not their difficult circumstances but rather the bad choices they have made in response to their difficult circumstances. This defendant's family circumstances were, however, quite exceptional.

6

In addition, the defendant received 2 points for being on probation for the attempted larceny conviction on May 2, 2002, and he received 1point for committing the instant offense less that two years after his release from custody for the revocation of his probation on August 13, 2001 in connection with his conviction on January 10, 2001 for possession of drug paraphernalia and maintaining a place for the sale of a controlled substance.

Based upon the defendant maintaining a crime free life from January of 2003 until his arrest for the instant offense on February 10, 2004, and because his Criminal History Category over represents his criminal history, the Court FINDS that a sentence within the defendant's advisory guideline range under the facts of this case is not necessary to reflect the seriousness of the offense, to promote respect for the law or to provide just punishment for the offense. The Court FINDS that a lesser sentence will protect the public from further crimes of the defendant.

4. ADVISORY SENTENCING RANGE ESTABLISHED BY THE GUIDELINES

The sentencing range established by the guidelines as calculated by U.S. Probation is 235 to 293 months based upon 496 grams of crack or at least 150 grams but less than 500 grams of crack which establishes a base offense level of 34. This Court has previously overruled the defendant's objection to the quantity of drugs used to calculate his guideline range; however, using the quantity of drugs found by the jury, i.e., more

7

than 50 grams of cocaine base, the defendant's guideline range would be 188 to 235 months based upon at least 50 grams but less than 150 grams of cocaine base which is a base offense level of 32.

5. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

There is a recognized need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Because the Guidelines are now merely advisory, the defendant may argue that the applicable guideline sentence is greater than necessary to achieve the purposes of the Sentencing Reform Act. 18 *U.S.C.* § 3553(a). "[T]he Guidelines ... are the product of policy decisions by the Sentencing Commission .... If those policy decisions are no longer mandatory, the sentencing judge is free to disagree with them." *Booker*, 125 S.Ct. at 790 n. 3 (Scalia, J., dissenting). However, in point of fact, the Sentencing Commission itself has long disagreed with the disparity in sentencing between cocaine base or crack and powder cocaine.

Generally, the Sentencing Guidelines are the only available guide for a district judge to use in attempting to impose uniform sentences. The guideline's treatment of crack cocaine versus their treatment of powder cocaine, however, may, in and of itself, create an unwarranted sentence disparity. The guidelines sentencing

8

structure for cocaine offenses was a result of the Anti-Drug Abuse Act of 1985. *Pub.L.* No. 99-570, 100 *Stat.* 3207 (1986). The Act created mandatory minimum sentences for trafficking in various controlled substances. See 21 *U.S.C.* § 841(b). In addition, it introduced what has come to be known as the "100-to-1" quantity ratio between powder cocaine and crack. The Act's ten-year mandatory minimum sentence is triggered by an offense involving five kilograms of powder cocaine or a mere 50 grams of crack.

In 1987, the Sentencing Commission adopted the 100-to-1 ratio and offenses involving five grams of crack were given the same Guidelines base offense level as offenses involving 500 grams of cocaine powder. Concern and criticism in regard to these sentencing disparities prompted Congress to enact the Violent Crime Control and Law Enforcement Act of 1994, which directed the Sentencing Commission to examine the issue and report "on issues relating to sentences applicable to offenses involving the possession or distribution of all forms of cocaine." *Pub.L.* No. 103-322, § 280006, 108 *Stat.* 2097 (1994). The Act specifically directed the Commission to consider "the differences in penalty levels that apply to different forms of cocaine." *Id*.

In 1995, the Commission issued a report that strongly recommended that the 100:1 ratio be reduced. On May 11, 1995, the Commission presented to Congress several amendments to the Guidelines. 60 *Fed.Reg.* 25,074 (1995). The Commission unanimously agreed that the 100:1 ratio was too great, and a majority recommended instead adopting a 1:1 equivalence between crack and powder cocaine. 60 *Fed.Reg.* 25077.

9

Although Congress did not adopt the amendment, it directed the Commission to make further recommendations regarding cocaine sentencing. See *Pub.L.* No. 104-38, § 2(a)(1)(A), 109 *Stat.* 334 (1995). The Commission was directed to maintain stiffer sentences for crack offenses than for cocaine offenses; however, it was free to recommend a less severe ratio. *Id*.

In 1997, the Commission issued another proposal, again stating that a 100:1 ratio was unjustifiable, and recommended a 5:1 ratio. In July of 1997, the Attorney General also recommended a 5:1 ratio, and the Clinton administration publicly proposed reducing the ratio to 10:1. However, no bill was introduced to implement any of these recommendations and no formal amendment to the Guidelines was proposed.

In 2002, the Commission again unanimously found that the 100-to-1 ratio was "unjustified." 2002 REPORT at 91. The Commission also stated that the ratio "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act." Id. The Commission concluded that the "intrinsic harms posed by the two drugs (e.g., addictiveness)" did justify some degree of difference in base offense levels, which could be reflected in a less severe ratio of 20:1. Id. at 93, 100, 106.

Using 496 grams of crack as found in the presentence report, if the Court were to employ either the 20:1 ratio most recently recommended by the Commission, or the 10:1 ratio recommended by the Clinton administration, the defendant's base offense level would be 32 rather than 34 with a Criminal History Category of V, resulting in a

10

sentence of 188 to 235 months. The Commission's 1997 recommendation of 5:1 produces a base offense level of 28, and a sentence of 130 to 162 months. Finally, the Commission's 1995 recommendation of a 1:1 equivalency results in a base offense level of 24, and a sentence of 92 to 115 months.

Using more than 50 grams of crack as found by the jury, if the Court were to employ either the 20:1 ratio or the 10:1 ratio, the defendant's base offense level would be 26 resulting in a sentence of 110 to 137 months. A ratio of 5:1 produces a base offense level of 20, and a sentence of 63 to 78 months. Finally, a 1:1 equivalency results in a base offense level of 16, and a sentence of 41 to 51 months.

Obviously, there is an extreme disparity between the defendant's present guideline range of 235 to 293 months (or the guideline range of 188 to 255 months based on the jury's finding of at least 50 grams), and the sentences that he could have received had any of the recommendations to reduce the 100:1 ratio of punishment between cocaine base and cocaine been approved. Clearly, defendants with similar records who have been found guilty of similar conduct are not treated the same utilizing the guidelines for cocaine base and cocaine.

Since *Booker*, a number of courts have accepted the argument that in cases involving crack, they should consider non-Guidelines sentences. See, e.g., *United States v. Smith*, 359 F.Supp.2d 771 (E.D.Wis.2005) (granting below Guidelines sentence to

11

defendant convicted of crack offense); *Simon v. United States*, 2005 WL 711916 (E.D.N.Y.)*; United States v. Carvajal*, 2005 WL 476125 (S.D.N.Y. ); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D.In.). This Court FINDS that a sentence below the advisory guideline range is also warranted in this case.

CONCLUSION

Taking all the foregoing factors into consideration, and taking into consideration the congressional mandate that sentences for crack offenses be stiffer than for cocaine offenses, the Court FINDS that the following factors outweigh the significant weight this Court has determined to give to the sentencing guidelines advisory range (regardless of whether this Court considers the range to be 235 to 293 months or 188 to 235 months).

    1. The defendant's history and characteristics as set forth above;

    2. His criminal history category which over states his criminal history and weighs in his favor against the likelihood that he will commit another offense;

    3. The fact that he withdrew from the conspiracy and led a productive life for one year prior to his arrest in this case weighs in his favor against the likelihood that he will commit another offense; and

    4. The unjustified disparity in the 100:1 quality ratio for punishment between cocaine base or crack and powder cocaine.

Based on a careful consideration of all the factors listed in 18 *U.S.C.* § 3553(a), the Court FINDS that a reasonable sentence for this defendant is one hundred and fifty-six (156) months on each count to run concurrently, a sentence that is sufficient, but not greater than necessary, to serve the purpose of sentencing established by the Congress. The Court specifically FINDS that a sentence of 156 months provides substantial and appropriate deterrence to those contemplating this offense, promotes respect for the law and provides just punishment based on the defendant's conduct.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE